# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| FIRSTBANK, § | |
| § | |
| *Plaintiff,* § | |
| § | Civil Action No. 4:21-cv-449 |
| v. § | Judge Mazzant |
| § | |
| TZK INVESTMENTS, LLC, § | |
| § | |
| *Defendant.* § | |
| § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Rule 59(e) Motion to Alter or Amend Memorandum Opinion and Order Granting Summary Judgment [Dkt # 36] and Supplemental Order of Certification of Partial Final Judgment [Dkt # 55] (Dkt. #57). Having considered the motion and the relevant pleadings, the Court finds that the Rule 59(e) Motion to Alter or Amend Memorandum Opinion and Order Granting Summary Judgment [Dkt # 36] and Supplemental Order of Certification of Partial Final Judgment [Dkt # 55] (Dkt. #57) should be **GRANTED.**

### BACKGROUND

On May 12, 2011, Defendant TZK Investments, LLC ("TZK") entered into a brokerage agreement (the "Brokerage Agreement") with an entity named Franklin Synergy Bank ("Franklin") (Dkt. #1, Exhibit 1). Franklin eventually merged into Plaintiff FirstBank ("FirstBank").

The Brokerage Agreement states that Franklin sought to sell mortgage loans on a bulk and/or flow basis, and that Franklin desired to obtain TZK's brokerage services, specifically in introducing Franklin to potential buyers of mortgage loans. The Brokerage Agreement also states:

> If Seller, or any of its affiliates, sells any of the Mortgage Loans to any Broker Contact whereby Broker introduced such Broker Contact to Seller, then, subject to Section 1(b), Broker shall be entitled to a fixed fee equal to 25 basis points (0.25%) of the outstanding principal balance of the Mortgage Loans as of the closing date of any and all such sales to Broker Contact (the "Commission"). "Broker Contact" shall mean any individual or a legal entity who buys Mortgage Loans from Seller whereby Broker introduced Buyer to Seller . . . .

(Dkt. #1, Exhibit 1 at p. 2). The Brokerage Agreement does not state a termination date. The Court previously determined that the Brokerage Agreement was a terminable-at-will contract (Dkt. #36 at p. 7).

After entering into the Brokerage Agreement, TZK connected Franklin with Capitol Federal, a potential buyer of Franklin's loans (Dkt. #17 ¶ 8). Franklin began selling loans to Capitol Federal in mid-2011, and Franklin paid commissions to TZK for each loan sold (Dkt. #17 ¶ 9).

Franklin merged into FirstBank on August 15, 2020 (Dkt. #17 ¶ 10). FirstBank continued selling loans to Capitol Federal and paying TZK commissions after the merger (Dkt #17 ¶ 11). As of December 31, 2020, TZK had received a total of $613,174.53 under the terms of the Brokerage Agreement (Dkt. #24 ¶ 30).

On March 16, 2021, FirstBank, through its general counsel, sent a letter to TZK providing FirstBank's "notice of non-renew and terminate the [Brokerage Agreement] in its entirety, without penalty" (the "Letter") (Dkt. #24, Exhibit 1 at pp. 59–60). TZK disputed FirstBank's right to terminate the Brokerage Agreement (Dkt. #24, Exhibit 1 at pp. 61–63). "Out of an abundance of caution," on June 14, 2021, FirstBank tendered TZK a check in the amount of $93,918, which FirstBank calculated to be the commissions owed to TZK for all loans sold by FirstBank to Franklin Synergy through March 16, 2021 (Dkt. #17 ¶ 17). FirstBank now asserts its calculation was incorrect because any commissions owed from January 1, 2021, to March 16, 2021,

would total $43,939.78 (Dkt. #17 ¶ 21). In total, TZK has received $707,092.53 in commissions for loans sold to Capitol Federal (Dkt. #24 ¶ 17).

FirstBank filed suit on June 14, 2021, seeking declaratory relief (Dkt. #1). Specifically, FirstBank requests a declaration that it terminated the Brokerage Agreement on March 16, 2021, a reasonable duration for the Brokerage Agreement has passed, and FirstBank owes no obligation to pay TZK commissions (Dkt. #1 ¶ 29).[1] In its answer, TZK denies FirstBank's allegations and asserts counterclaims for declaratory relief and breach of contract (Dkt. #6). TZK seeks a declaration from the Court that: (1) the Brokerage Agreement was not terminable at will; (2) the Brokerage Agreement was not validly terminated; (3) the Brokerage Agreement cannot be terminated so long as FirstBank sells loans to Capitol Federal; and (4) even if the Brokerage Agreement was validly terminated, FirstBank is still obligated to pay TZK commissions for loans sold to Capitol Federal (Dkt. #6 ¶ 27).

On September 14, 2021, FirstBank made a formal demand on TZK to return the alleged overpayment of commissions within thirty (30) days (Dkt. #24, Exhibit 1 at pp. 71–72). TZK did not pay FirstBank any amount of money. Accordingly, on October 22, 2021, FirstBank amended its complaint, adding claims for unjust enrichment, money had and received, and conversion based on its alleged overpayment of commissions (Dkt. #17).

TZK moved for summary judgment on January 7, 2022 (Dkt. #23). FirstBank responded on February 11, 2022 (Dkt. #27). TZK replied on February 25, 2022 (Dkt. #34). FirstBank also moved for summary judgment on January 7, 2022 (Dkt. #24). TZK responded on February 11,

---

[1] FirstBank's request for declaratory relief constitutes one singular cause of action where it requests declarations that the Brokerage Agreement was terminated on March 16, 2021, that a reasonable duration for the Brokerage Agreement has long since passed, and FirstBank owes no obligations to pay commission pursuant to the Brokerage Agreement after March 16, 2021 to TZK (Dkt. #17 ¶¶ 28–29).

2022 (Dkt. #29). FirstBank replied on February 25, 2022 (Dkt. #35).

The Court denied TZK's motion for summary judgment and partially granted and partially denied FirstBank's motion for summary judgment (Dkt. #36). Specifically, the Court determined that TZK's counterclaim for breach of the Brokerage Agreement necessarily fails because FirstBank retained no further obligation to pay TZK commission for sales to Capitol Federal (Dkt. #36 at pp. 9–12). This decision hinged on the Court's finding that the procuring-cause doctrine does not apply to this case (Dkt. #36 at pp. 9–11). Additionally, the Court granted summary judgment in favor of FirstBank on its requested declaratory judgment that the Brokerage Agreement was terminated, and it owed no further obligation to pay commissions to TZK (Dkt. #36 at pp. 8–11).

Next, the Court certified partial final judgment regarding FirstBank's requested declaratory judgment and TZK's counterclaim for breach of contract (Dkt. #55). Additionally, the Court stayed further proceedings in the case pending the outcome of the appeal of the claims certified for partial final judgment (Dkt. #56).

However, on May 20, 2022, the Supreme Court of Texas issued *Perthuis v. Baylor Miraca Genetics Laboratories, Inc.*, which dealt with the procuring-cause doctrine. 645 S.W.3d 228 (Tex. 2022). This opinion clarified the function of the procuring-cause doctrine under Texas law. *Id.* Further, the Supreme Court of Texas issued *Perthuis* seven days before the Court issued its order regarding the parties' motions for summary judgment. *See id.* The Court did not consider *Perthuis* in writing its order because it was not aware of *Perthuis* at the time that the order issued.

On October 4, 2022, TZK filed a motion to alter or amend the Court's previous decision regarding the parties' motions for summary judgment and its certification of partial final judgment

based on *Perthuis* (Dkt. #57). FirstBank timely filed its response (Dkt. #61). TZK timely filed its reply (Dkt. #62).

## LEGAL STANDARD

A Rule 59(e) motion "calls into question the correctness of a judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In Re Transtexas Gas. Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.* at 479 (citing *Clancy v. Emp'rs Health Ins. Co.*, 101 F. Supp. 2d 463, 465 (E.D. La. 2000)). In the Fifth Circuit, Rule 59(e) standards "favor the denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993) (citations omitted). Under Rule 59(e), amending a judgment is appropriate (1) where there has been an intervening change in the controlling law; (2) where the movant presents newly discovered evidence that was previously unavailable; or (3) where there has been a manifest error of law or fact. *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012) (citing *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003)). A motion under Rule 59 cannot be used to raise arguments or claims "that could, and should, have been made before the judgment issued." *Id.* (citing *Marseilles Homeowners Condo. Ass'n v. Fid. Nat. Ins. Co.*, 542 F.3d 1053, 1058 (5th Cir. 2008)).

## ANALYSIS

*Perthuis* significantly alters the Court's analysis of whether FirstBank owes commissions to TZK for sales to Capitol Federal after FirstBank terminated the Brokerage Agreement. Where the procuring-cause doctrine applies, a "broker's entitlement to a commission vests on his having *procured* the sale, not on his actual involvement in a sale's execution or continued employment

5

through final consummation of the sale." *Perthuis*, 645 S.W.3d at 234–35. "[A]bsent contractual language to the contrary—the contract deems a sale to be the broker's sale if the broker, while under contract with the owner, made the sale possible." *Id.* at 235. "When a [party] seeks to recover commissions under the procuring-cause doctrine . . . three main questions arise." *Id.* at 234. "First, did the parties have the kind of contractual relationship to which the procuring-cause doctrine applies?" *Id.* "If so, did the parties displace the doctrine by the terms of their contractual agreement." *Id.* "Finally, if the procuring-cause doctrine applies to the parties' dispute and was not displaced, to what extent does the doctrine impose liability for the specific commission payments that the plaintiff demands?" *Id.*

In the first three sections of analysis in this order, the Court addresses the three questions to determine whether the procuring-cause doctrine applies. *See infra* Parts I–III. Then, the Court considers whether it should read a term of reasonable duration into the Brokerage Agreement. *See infra* Part IV. Finally, the Court considers whether a continued certification of partial final judgment is appropriate in this case. *See infra* Part V.

I. **Whether the Brokerage Agreement Is the Type of Contract that the Procuring-Cause Doctrine Applies to**

TZK argues that *Perthuis* established a bright line rule that the procuring-cause doctrine applies to agreements to pay commissions for sale as a default rule (Dkt. #57 ¶ 10). Further, TZK asserts that whether an agreement arises in the real estate brokerage context makes no difference as to whether the doctrine should apply (Dkt. #57 ¶ 12). Therefore, TZK claims the procuring-cause doctrine should apply to the Brokerage Agreement because it was an agreement to pay commissions for sale (Dkt. #57 ¶ 14).

FirstBank makes two primary arguments addressing the applicability of *Perthuis* to this case. First, FirstBank claims that *Perthuis* presents no new law because it merely reiterates that the procuring-cause doctrine applies only to certain contracts and does not override the will of the parties (Dkt. #61 ¶¶ 4–6). Second, FirstBank argues that even if *Perthuis* represents new controlling law, the Court properly determined that the procuring-cause doctrine does not apply to the Brokerage Agreement and that the doctrine was displaced regardless (Dkt. #61 ¶¶ 7–10).

*Perthuis* constitutes new controlling law regarding the procuring-cause doctrine because it clarified that the doctrine applies to commission for sale contracts as a bright-line rule. *Perthuis*, 645 S.W.3d at 234, 237 ("[T]he minimum prerequisite for the doctrine to apply is an agreement to pay a commission on a sale.") ("Because the employment contract here promises commissions for sales, BMGL and Perthuis's contract is the kind to which the procuring-cause doctrine applies."). In *Perthuis*, the Supreme Court of Texas applied the doctrine to a contract providing commissions for the sale of genetic tests (as opposed to a real estate brokerage agreement) where the contract was a written agreement setting out the terms of the compensation structure. *Id.* at 231–32. The Court previously declined to apply the doctrine to the Brokerage Agreement because it is a "written agreement setting out the terms of the compensation structure . . . outside the context of [a] real estate brokerage agreement[]" (Dkt. 36 at p. 10). Therefore, *Perthuis* demonstrated that the doctrine is the "default rule" for commissions for sale contracts and applies "far beyond the real-estate industry." *Id.* at 234.

When the Court partially granted FirstBank's motion for summary judgment, it did not apply the procuring-cause doctrine according to the principles of *Perthuis* (Dkt. #36 at pp. 9–11). The doctrine acts as the "default rule" for commissions for sale contracts. *Perthuis*, 645 S.W.3d at

7

234. Such contracts may displace the doctrine through "terms that in some way cabin the textually imposed contractual obligation to pay a commission." *Id.* at 237. However, the Court's previous analysis did not apply the doctrine as a default rule and found that "the Brokerage Agreement does not contemplate the procuring cause standard" (Dkt. #36 at pp. 9–11). This analysis was incorrect because it did not follow the analytical framework outlined in *Perthuis*. *See Perthuis*, 645 S.W.3d at 234.

Under the Brokerage Agreement, TZK and FirstBank had the kind of contractual relationship to which the procuring-cause doctrine applies. As previously discussed, the doctrine applies to agreements to pay commissions for sale. *Id.* The Brokerage Agreement was an agreement to pay commissions for sale because it provided TZK with 0.25% of the outstanding principal balance of mortgage loans (as of the closing date of each sale) sold to the broker contact by the seller (Dkt. #1, Exhibit 1 at p. 2). *See Perthuis*, 645 S.W.3d at 231 (Perthuis's commissions for sale agreement stated "[y]our commission will be 3.5% of your net sales."). Therefore, the doctrine applies to the Brokerage Agreement and the next issue is whether language in the Brokerage Agreement displaces the doctrine.

II.   **Whether Language in the Brokerage Agreement Displaces the Procuring-Cause Doctrine**

TZK argues that no language in the Brokerage Agreement displaces the procuring-cause doctrine (Dkt. #57 ¶¶ 15–22). Specifically, TZK outlines the structure of the commission arrangement in the Brokerage Agreement and claims that it did not contain language limiting the application of the procuring-cause doctrine (Dkt. #57 ¶ 21). Further, TZK claims that "[t]he Brokerage Agreement *could have* included other limitations on TZK's right to commissions [other

than an introduction of the buyer to the seller and a closing of a purchase between the two]" and that the "contractual silence 'leaves the procuring-cause doctrine intact'" (Dkt. #57 ¶ 21).

In response, FirstBank argues that the procuring-cause doctrine does not apply to the Brokerage Agreement because the contract applied a different standard (Dkt. #61 ¶ 12). "[T]he [B]rokerage [A]greement provides for payment of a commission for broker contacts 'introduced' by TZK" (Dkt. #61 ¶ 12). "'Mere introduction does not approximate to the procuring cause standard, which requires the broker be 'instrumental' in brin[g]ing about the sale'" (Dkt. #61 ¶ 12) (quoting Dkt. #36 at pp. 10–11).

Contrary to FirstBank's argument, no "opt-in" is required for the procuring-cause doctrine to apply. *Perthuis*, 645 S.W.3d at 241. Rather, the procuring cause doctrine "requires *opting out*, not the other way around." *Id.* Where an agreement is silent regarding the parties' intent about the obligation to pay commissions upon the employee's termination, the procuring-cause doctrine applies. *Id.* at 240. In other words, where a "contract is *silent* about any *exceptions* to the obligation to pay commissions," the procuring-cause doctrine applies. *Id.* To opt out of the doctrine, a contract must merely "provide terms that are inconsistent with" the doctrine through "*terms that in some way cabin the textually imposed contractual obligation to pay a commission.*" *Id.* at 237 (emphasis added).

The only reasonable interpretation of the Brokerage Agreement the parties have offered is TZK's interpretation that the Brokerage Agreement did not include any language to displace the procuring-cause doctrine. The Brokerage Agreement contained provisions describing the obligation to pay commissions (Dkt. #1, Exhibit 1 at p. 2). The language requiring that broker contacts be "introduced" by TZK described when the obligation to pay commissions arose

9

(Dkt. #1, Exhibit 1 at p. 2).[2] However, the agreement was silent about any exceptions to the obligation to pay commissions, including how TZK's termination would impact such obligation (Dkt. #1, Exhibit 1 at p. 2). In such silence, the Brokerage Agreement did not contain any terms that cabin the textually imposed contractual obligation to pay commissions and no language in the Brokerage Agreement displaces the procuring-cause doctrine.

### III. Whether TZK Was the Procuring Cause of the Sales of Mortgage Loans by FirstBank to Capitol Federal

After a careful review of the record and arguments presented, the Court finds that a genuine issue of material fact exists as to whether TZK was the procuring cause of FirstBank's sales of mortgage loans to Capitol Federal. A party that "properly invokes the procuring-cause doctrine to recover sales commissions must prove that the specific sale was the direct and proximate result of the [party's] efforts or services." *Perthius*, 645 s.W.3d at 241–42. "A [party] meets that burden by proving the [party] set in motion 'a chain of events . . . which, without a break in their continuity, case the buyer and seller to reach agreement on the sale' as a primary and direct result of the plaintiff's efforts." *Id.* at 242. "This necessarily requires the [party] to be both the 'proximate' and 'but for' cause of those sales." *Id.* However, "[t]he [other party] must be free to show that the causal link was severed." *Id.*

### IV. Whether the Court Should Read a Term of Reasonable Duration into the Brokerage Agreement

FirstBank also requests the Court declare that a reasonable duration for the Brokerage Agreement has passed. "[I]n certain circumstances, a reasonable time should be read into an

---

[2] Similarly, the Brokerage Agreement's provision that commissions "shall be payable upon, and only, if the actual closing of a purchase of any of the Mortgage Loans shall occur" described when the obligation to pay commissions arose (Dkt. #1, Exhibit 1 at p. 2).

otherwise terminable-at-will contract." *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 857 (5th Cir. 2004) (citing *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 391 (Tex. 1977)). When a court reads a reasonable time into an otherwise terminable-at-will contract, the reasonable time is a period of time during which the agreement is not terminable-at-will. *Clear Lake City Water Auth.*, 549 S.W.2d at 391. To imply a term into an agreement, it must appear that it is necessary to do so in order to effectuate the purposes of the contract as a whole as gathered from the written instrument. *See HECI Expl. Co. v. Neel,* 982 S.W.2d 881, 888 (Tex. 1998); *Fein v. R.P.H., Inc.,* 68 S.W.3d 260, 268 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Additionally, "*Clear Lake* and *Trient* both indicate that a contract's contemplation of a party's substantial expenditure is a prerequisite for reading in a reasonable duration contract term." *Fluorine*, 380 F.3d at 858 (citing *Clear Lake City Water Auth.*, 549 S.W.2d at 391 & *Trient Partners I Ltd. v. Blockbuster Ent. Inc.*, 83 F.3d 704, 704 (5th Cir. 1996)). The Court cannot find language in the Brokerage Agreement that evidenced contemplation of such a substantial expenditure. Further, the Court cannot find a reason why implying a term into the Brokerage Agreement is necessary to effectuate the purposes of the contract as a whole. Accordingly, the Court declines to imply a reasonable duration into the Brokerage Agreement and decide whether such duration has passed.

### V.     Certification of Partial Final Judgment

Federal Rule of Civil Procedure 54(b) requires that "[a] district court must first determine that it is dealing with a 'final judgment.' It must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss-*

*Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956). Neither TZK's breach of counterclaim nor FirstBank's request for declaratory judgment have reached ultimate disposition an individual claim because a genuine issue of material fact remains as to whether TZK was the procuring cause of the relevant sales of mortgage loans by FirstBank to Capitol Federal. Therefore, the Court vacates the Supplemental Order of Certification of Partial Final Judgment (Dkt. #55).

## CONCLUSION

It is therefore **ORDERED** that the Rule 59(e) Motion to Alter or Amend Memorandum Opinion and Order Granting Summary Judgment [Dkt # 36] and Supplemental Order of Certification of Partial Final Judgment [Dkt # 55] (Dkt. #57) is hereby **GRANTED.**

It is therefore **ORDERED** that the Supplemental Order of Certification of Partial Final Judgment (Dkt. #55) is hereby **VACATED.**

It is therefore **ORDERED** that the **STAY** previously imposed (Dkt. #56) is hereby **LIFTED.** The Court will enter a separate scheduling order to govern the further disposition of this action.

**IT IS SO ORDERED.**

SIGNED this 27th day of November, 2023.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE